The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw an eye and give their attention for the Court is now sitting. God save the United States and this Honorable Court. All right, be seated please. First case we'll hear today is Williams v. Fairfax County and Ms. Vizaghi, I guess it is, will hear from you first. Good morning, Your Honors. Roy Vizaghi for the appellant Mr. Edward Williams. May it please the Court. This case was dismissed on summary judgment for the sole reason that the trial court held that Mr. Williams did not put forth sufficient evidence to show causation to permit Mr. Williams case to get to the jury. The causation, the decision of the trial court was based solely on temporal proximity. The trial court was required to take the facts in the light most favorable to my client, the non-moving party, but instead took the facts and evaluated the facts in the light most favorable to the county, the moving party, and in fact in the absolute most favorable light, just ignored all contradicting evidence set forth by my client. There was no small amount of evidence of temporal proximity between the protected activity when Mr. Williams made the complaint about Sonia Arenal, his de facto supervisor, expressing discontent with his openness about his sexuality and his marriage to a man. There was temporal proximity, evidence of temporal proximity between that complaint and the retaliatory actions that took place leading up to Mr. Williams' termination from the county. There was also evidence... Let's assume you have sufficient temporal proximity. A lot happened in between and a lot up and down went in between, so you could question that some. At some point then you still have to determine whether the county came forward with a legitimate non-pretextual reason for firing him or letting him go. He was a probation employee, right? Probationary? Yes, he was in his probationary period. Yes, Your Honor. That is correct. The county did put forth a reason that on its face seemed like a legitimate reason. I mean, it was quite dramatic, wasn't it? They reviewed, what, 75 cases and about half of them didn't have the risk resolved. Not quite yet. There's a highly public issue concern there that the whole agency, at the foundation of the whole agency, is to take the risk of children out and have them placed and making sure that they're not in an environment that's harmful. In 30-some cases, 35 cases or so, that was not resolved. It alarmed the agency and ultimately, who was it, Mr. Becketts terminated him. Ultimately he was terminated by Mr. Becketts, Your Honor. In April. Beginning of May. Early May. Early May 2020. He was put on suspension, administrative leave on April 30th. There was a review of Mr. Williams' cases and that was spurred by the April 10th referral, which was the second time the family was coming before the department. The first time it was handled by Mr. Williams' supervisor and if I may just go back and correct, there was not a review of all of Mr. Williams' cases. There was a select review that stemmed from the April 10th referral, but if I could go back and... I thought they came up with the notion that roughly 50% of the cases they reviewed were problems. That is in the county's briefs, Your Honor. That is not what the report says. What the report says is from the select subset of Mr. Williams' cases that were reviewed due to documentation, it was unclear whether or not 50% of the cases were closed prematurely. Not that they were definitively closed prematurely, but that it was unclear based on the documentation. So I want to be very clear that child safety... One other point of clarification. Yes, Your Honor. There was also, I thought they said two-thirds of the safety plans lacked any reasonable safeguards. Also, that 50% of the safety plans did not have any proper safeguards. That, I also believe, is in the county's brief and I don't believe that that is verbatim what the report says. There is a note about appropriate safeguards. There is a lot about documentation. I just wanted, if I could go back before I go back to the safeguards, I want to be very clear that the April 10th event, what happened with the children, nobody disputes, was traumatic for the two children that were in the car with their parents, with the mother. What I am saying, and there is no dispute that child safety is important, what I am saying and what the evidence below shows is that there was nothing that Mr. Edwards did that directly contributed, or didn't do, that directly contributed to what happened on April 10th. There is evidence that there was inadequate supervision. His notes didn't say anything about the safety of the children, what the risk was. At least, that was the evidence, was it not? Your Honor, in the March notes from the initial, when the referral was Mr. Williams, because in April, the referral was no longer Mr. Williams. When it came in the second time, it was not his. It went directly to another supervisor. But in April, it belonged to one of his supervisees, by the first name of Letitia, and you know this is, I don't mean to cut you off, but you know, this is really almost shocking in terms of this record. Usually, we have closer issues, and it seems to me that a lot of times, it's difficult to discern whether the reasons given by the employer are pretextual. It seems to me you've got a really, really big problem here of showing that the county's reasons were pretextual in face of this record, particularly the fact that his notes were so incomplete that he apparently did not document any consideration for the safety of the children in the situation where the mother overdosed with the young children in the car. I mean, how can you say that the county, where is the evidence at all of pretextual reasons in this kind of shocking allegation? So, I want to clarify, and I think it's very difficult to clarify. The April, there are two incidents. The one that was Mr. Edwards' responsibility, and he was supervising the program, the caseworker, was the March incident. There was no overdose in that incident. There was two parents and a mentally ill father, and the mother had given the mentally ill father the baby to hold, and that's why CPS was called. Mr. Williams' caseworker went out, evaluated the safety, decided that at that time, the safety plan, there was a safety plan put in place. The father was not to be alone with the children. The mother could be with the children. The mother was supposed to get drug tested because there was a history of substance abuse. Right, but what did Williams' notes and his case notes show at that time? He didn't, his case notes, it was the caseworker's case notes for the March referral, not Mr. Williams' case notes. Okay, but apparently, there was only one supervisory note from Williams that made no reference to the safety of the children or ongoing considerations of risk or anything to manifest that as a supervisor, he had a level of concern for these children. At the time, based on the March referral, or the March, I'm saying referral, but the March incident, there was no, there was follow-up to be had based on, to require the mother to get drug testing, but there was a safety plan in place, and there was follow-up and calls after the safety plan was put in place, and there was no safety issue at that time. There was follow-up, and then the caseworker went on vacation, and the April 10th referral came up and went to another program manager. That's when they discovered the inadequacy of the record, and that did not prompt his termination. What that prompted was a review of his other work, and his other work, then, I don't know what the proper adjective is, but from their point of view, it was not just a few cases. It was a total failure to carry out the agency's functions, and I don't know. You can but they did do a review of what he had been working on, and I think they were alarmed. The county's documentation does show some level of concern. I am not minimizing, again, the April 10th incident or child safety. What my focus is, is that the appellant had put forth in the trial court evidence that this was not how all cases were evaluated, and this was not what was being required of him, was not necessarily what was being required for all other case program managers. The April 10th discovery of the inadequacy of the file and the notes, and the risk, leaving open risk unresolved, prompted an investigation, and the investigation was of, I thought they had investigated 75 cases. You say not. Whatever they did, didn't he have a caseload of about 75 cases? He did have a caseload of 75 cases, your honor. Anyway, they reviewed enough of them that they were alarmed, and everybody then proceeded to action, and I didn't see a touch of evidence that it was based on the fact of his gayness or his gender or sex. As a matter of fact, Mr. Beckett's himself was in the same gender classification. So, I'm just, you know, the case was basically thrown out because there's no showing that this was pretextual, and whether we examine whether they over-assessed it or whether they were clearly alarmed, weren't they? From their point of view? They represented, the county represented that they were alarmed, but I want to be very clear that what I'm focused on is not that reviews were done because of my client's sexual orientation, the appellant's sexual orientation, but because he made a complaint about a long-time, very well-respected member, a former supervisor, and his coach at the time, and de facto supervisor for making comments about his sexual orientation. There's no dispute in the record that she said, you should not be open about your relationship, and he went and complained about it to his immediate supervisor. That was handled so completely. The person who reviewed it, understood it, supported him, was also gay. She never talked with, no, she was not. That was Karen DiMeggiano. DiMeggiano. Anyway, she was totally supportive. It seemed to me that that was, it's hard to complain about. I don't think he complained about how that was handled, did he? Did she address it very fully? No, your honor. That is actually a basis for, one of the bases for the appeal that the trial court didn't consider that the investigation, the HR investigation, was not handled thoroughly, that my client was only interviewed once verbally, not by the main investigator, and then Ms. Arenow, the well-respected, now former county employee, was interviewed not once, but three times, and submitted a written statement. And in that second interview, Ms. Arenow also flagged performance concerns for the first time on her way out in retaliation for Mr. Williams making the complaint against her. In the briefs, it is well documented and supported with cites to the record that this investigation wasn't done in good faith and wasn't done properly. We're not micromanaging or questioning how investigation should be done, but it is very one-sided, and that it was closed. And there are statements from Robin Harding, who did the investigation, saying, there's no need for me to talk to Mr. Williams again. It's very clear. Arenow made the comment. She's very sorry. She meant it. She meant well. She meant it in a way that was supposed to support him, by telling him that he should not be open about his marriage to a man. The interviewers, the HR individuals, were very sympathetic to Ms. Arenow and didn't interview anyone else other than Ms. Arenow three times and my client once. And that's part of the evidence at the trial court level for the fact that Mr. Williams was retaliated against for making the complaint, and his complaint was not taken seriously. Ms. Arenow was set to retire. The county didn't terminate Ms. Arenow. She was set to retire within 17 days of the complaint being made. If I may, because I am running short on time and would like to reserve at least a few seconds for rebuttal, I just want to point out to your honors that Joint Appendix 998, Orianne Erickson, a division head in the Children, Youth, and Family Services Division, noted that there's no way with the volume that we have that somebody could be in every case, somebody in Mr. Williams' position. And that's not the program manager's role. So I just want to leave the court with that and reserve my remaining few seconds for rebuttal. Thank you. All right, thank you. All right, we'll hear from Ms. Greenspike. Good morning. May it please the court, my name is Jamie Greenspike and I represent the appellee, Fairfax County. And we would request that the district court's grant of summary judgment be affirmed because it was properly supported by the record. As it's been pointed out, there was a significant gap in temporal proximity between the time that the complaint was made and the time that Mr. Williams was separated from county employment. And as the court noted, there was an investigation following that January 16, 2020 complaint that was made by Mr. Williams. And he initially made the complaint to his direct supervisor, Ms. Damahongo, who, as you indicated, was completely supportive of him. She offered to support him in any way that he needed in making the complaint. She offered to support him with employee assistance program services, time off to do so. And she also told him that she would cancel the remaining coaching session that he had scheduled with Ms. Arenow. She did do that and Mr. Williams was never again required to meet with, interact with, communicate in any way, shape or form with Ms. Arenow. And it's not disputed that following that January 15 meeting, he never did in fact have any more communications with Ms. Arenow. When Mr. Williams went to the human resources department for the agency, he met with Kamala Kawahara, who took down his statement of events. Ultimately, that his version of events, as again, you indicated, was adopted by the agency. They found that what he said was true, that the comments made by Ms. Arenow were in fact made. And that's in part... But they did come back and say something about, oh, but she had good intentions. You would dispute that, right? I don't know exactly how it is that they phrased it, Your Honor. I believe it was something along the lines of she intended it to be guidance for boundaries. But regardless of her reason for doing it, they told him that comment and they told her, more importantly, they told her that comment was inappropriate and it's not in line with Fairfax County values. So for whatever reason you made that statement, you shouldn't have made it. And another point I'd like to make is that the county HR also told Ms. Arenow, in addition to Ms. Damohongo, don't have any further communications with Mr. Williams. And so that point was reasserted by the human resources manager for the Department of Family Services. So after this January 16th complaint, Mr. Williams is operating more independently. He no longer has a coach. Him and Ms. Damohongo had agreed that he no longer needs a coach. And so he's going about operating more independently as a CPS supervisor. I would just note that the last comment made by my colleague that not all program managers can know all cases, Mr. Williams was not a program manager. He was a CPS supervisor. And so in terms of what's the importance of that, Ms. Damohongo was the program manager. And so she has five CPS supervisors under her, each of whom are responsible for 75 cases. And so seven, five times five, I should know that off the top of my head, I'm sure. But that's a lot of cases. And so Ms. Erickson was simply saying, Ms. Damohongo is not going to know everything about all of these cases. But the CPS supervisor is responsible for knowing everything about the cases of the subordinates over whom he has supervision. His primary job duty really is, on a weekly basis, Mr. Williams as a CPS supervisor was required to meet with his subordinates and to go over every one of their cases. And at any given time, that could amount to up to 75 cases. And that's the job. And so he's responsible for knowing what's going on in every case, and he has to document that, and what is his guidance for those cases moving forward. And that's an electronic database. And the requirement for documentation, you know, the appellant frequently kind of makes flippant remarks to, oh, these are administrative duties. These are mandates by the Virginia Department of Social Services to protect the safety of children, but also what it is that needs to be documented. So in terms of this review that takes place after the April 10th incident, what they're reviewing is objective data. What's the information that has been inputted by Williams' unit into the electronic database? And does that match up with what's required to be in that system by the Virginia Department of Social Services mandates? And they did find that in 50% of cases, it was either that determination that the children were safe, was unable to be made, or affirmatively that the children, the case was closed before the children were safe. And in fact, that they weren't safe when the case was closed. Were there any open cases in this database? Yes, Your Honor. There were both open and closed cases. And Ms. Demahongo reviewed the open cases. Quality Programs is a separate department within the Department of Family Services that reviewed the closed cases dating back January, February, March, after Mr. Williams was operating more independently. And the findings between Ms. Demahongo and the Quality Programs were consistent in that there were two thirds of cases in which appropriate referrals weren't made. There were 50% of cases that were closed without a determination, without having been able to make a determination that the children were safe. And that really was the issue that came up on April 10th, was that there was this open case from March that Ms. Demahongo saw when she looked at the case history after getting that call. And there's nothing in the case notes. And Mr. Williams seems to, wants to deflect accountability for the March 10th case and the April 10th, and I'm sorry, the March 15th and the April 10th case. But the fact of the matter is, he's the supervisor over them. Had the March 15th case been better handled, we wouldn't have the April 10th referral. That was Ms. Demahongo's point. You have an issue on March 15th where you have children who are in a house with parents who admit that they're drug abusers. The mother's handing an infant to the father who's having a mental health crisis saying, oh, this will help calm him down, which is ludicrous. But that's what she's doing. The mother initially agrees that she'll submit to drug testing, but she says, but I'll fail it. No plans put in place for drug treatment. Ultimately, the mother refuses to submit to drug testing and nothing more is done. They just want to close the case. Well, now things have changed. The mother's not agreeing to drug treatment. She's not agreeing to drug testing. What are we doing? Are we doing a protective order? There's no notes. Who knows? Ms. Demahongo has no idea what's going on in the case because the notes aren't in the case file. And Mr. Williams is responsible for those notes. And so when the April 10th referral comes in, she says to Mr. Williams, what's going on with this case? I need to know. I'm trying to put a for this egregious event that just happened. And I don't know. Well, the CPS worker, she's out on vacation, so we really don't know what happened in that case. But he had recommended it for closure. That's the only thing we know from the only note that he put in the file, was that he supported closing the file before there was any determination made that these kids were safe from their substance abusing parents. And that was tremendously concerning and alarming for Ms. Demahongo. And so initially, all she did was look through a handful of cases. Is this a prevalent pattern where he's not properly handling cases? Or is this a one-off? And after she looks at a few cases, she becomes increasingly concerned because it doesn't look like it's a one-off. And so she goes to Ms. Erickson and she says, hey, look, we might have a problem here. I think that we should review this further. And that's when the decision to have an audit by quality programs and for Ms. Demahongo to continue reviewing the open files is done. Those reports come back, again, consistently that there's a number of failures on the part of Mr. Williams, including, again, failure to make appropriate referrals in two thirds of cases, and failure to provide clear supervisory guidance in three quarters of the cases. And that's his primary job, is to provide supervisory guidance to his subordinates. And he's not doing it. It's not simply an administrative task. And so when Erickson gets these reports from both Ms. Demahongo and from quality programs, she reviews them. And she recommends that Mr. Williams be separated based on them. She sends those reports to the director of the agency, Michael Vecchetz, who is a gay man who's also married to a man. He reviews the reports. And he initially puts Mr. Williams on administrative leave, noting that the cases will be reviewed for possible discipline. And shortly thereafter, within about a week, he issues an unsatisfactory service separation memo terminating Mr. Williams from county employment. Mr. Williams was in his probationary period, such that he was not yet a merit employee. And these failures on his part, after having had significant assistance with a coach and having been on the job for numerous months, were unacceptable. It is the foundation of the agency to protect children, among other things. But making sure children is safe, it's one of the most vulnerable populations. This kind of poor supervision could not be allowed to continue. And Mr. Vecchetz noted that in his unsatisfactory service separation, that in the areas of child safety assessment, supervisory guidance, and safety and monitoring safety plans, simply was not being done by Mr. Williams. And that's the reason that Mr. Williams was separated from county employment. I have 10 minutes left, but if you all have any questions, I'm happy to answer them. Thank you very much. Thank you. All right. Ms. Maseki. I'd like to go back to the investigation, because my colleague highlighted some things that are contradicted by the record. Going back to the investigation, the quality control investigation, there was an initial investigation by Ms. DiMegengo, the immediate supervisor, that my colleague just referenced. Those documents were never produced, what cases caused alarm from Mr. Williams' case docket. And then the quality assurance assessment was done. I've already noted some discrepancies in the language of the county's brief compared to the quality assurance assessment. And my colleague represented correctly this time for the court, that this documentation wasn't sufficient. But there was a note and another mention of in two-thirds of the cases, the appropriate referrals weren't made. At the end of that report, Ms. Slappy's report, it says at the bottom very clearly that the appropriate referrals were not made in the domestic violence cases, but this is a failure of the county. And this has been a systemic problem in the county. And this is a good opportunity for the county to train its employees on how to do this better. Mr. Williams was in charge of all 75 cases. But at any given moment, he couldn't know all of the details for the 75 cases from memory. He had the notes in the system and he had meetings with his case workers, the staff workers. The March 10th case that we're talking about that led to the the alarm over the April 10th referral. I want to be very clear, the April 10th referral was with another supervisor, not Mr. Williams. That was a different case. There were some concerns about the notes. Ms. DiMegengio, when the referral came in on April 10th, it went to the other supervisor. Ms. DiMegengio came back on April 15th in an email and asked Williams to give a timeline of what happened because this was a dire situation. The second time was a very alarming situation and the county should be moving quickly. She asked Mr. Williams to put together a timeline of events looking at the notes. He directed her not to bother his case worker who was on leave. That is part of why Appellate's position is that this investigation and how he was handled wasn't done properly. We don't know how other probationary employees were treated. We tried to get that information in Discovery and weren't able to get that information from the county. You say you weren't able. Did you ever file a motion to compel? We did not file a motion to compel. There was no pursuit on it. It's basically a complaint that what was served. Discovery is an adversary process too and both sides serve on each other. If you object to Discovery, you don't think you got what you want. You ask for more and if they refuse, you go to the court. That wasn't done. I don't see how you can say we didn't get everything we wanted and say that's something we should review. Did try, Your Honor. That is correct. The motion to compel was not filed. Depositions were, as in most cases, depositions were challenged to schedule. There was dispute over corporate depositions, scope of the topics. There was many meet and confers about the scope of what had been produced and what's left, but you were correct. There was no motion to compel filed. The documentation and the way that Mr. Williams was asked to come up with the documentation for the protective order in that very dire situation that another supervisor was handling, it just doesn't make sense. If it was a dire situation, why couldn't Mr. Williams reach out to the case worker to fill in any details? He was put on the spot with given some notes that maybe could have been fuller in the system for the March referral, but he wasn't given the opportunity to be able to actually diligently put together the information for Ms. Domingo to take to the other supervisor so that she could handle the referral. As far as the record shows, the protective order wasn't drafted until April 16th, six days after the referral came in. I just also want to point the court to the mandate from Ms. Domingo that yes, all cases should be evaluated thoroughly and children's safety is a priority, but there was also a mandate from her department, from Domingo, to close cases within two and three weeks. There was a lot of criticism for backlog of open cases and a mandate to close cases, but then also criticism of the notes not being sufficient and cases being closed. The quality assurance report that is the basis of the termination... If they want you to close cases within a few weeks, they basically want you to take the action that's mandated, which is to go out and find out what's going on and to make sure that steps are taken to protect the children. It's like a lawyer who has a caseload. You can let them sit or you can work them. If there's a push to try to close cases, that's probably for the public safety, number one, and number two, to keep things moving. I don't read that to mean that they're supposed to close the cases without resolving the risks. Absolutely not, but there is a resource question as well and one person being in 75 places at once. Yes, Your Honor. I may just close with the investigation that was the basis of the termination. I just want to note, again, it's in the briefs that April 30th is when the administrative leave memo came out and said, we are going to be investigating your cases. The investigation had already been underway and completed by April 24th, so there's inconsistencies there as well between the county's reasons for termination and how they handled the termination and what actually happened, which also should be construed in the light most favorable to my client. Ultimately, the decision to terminate him had already been made on April 30th. In fact, two drafts of the unsatisfactory service separation, effectively the termination So there are discrepancies in the record between what the county is saying now and what actually happened based on the evidence in the court below. Is that it? If I could just have- We do have a red light. One moment. Oh, I apologize. Sorry. Yes, Your Honor. Thank you. If you had something, I don't want to cut you off if you had something important to add. I appreciate it. Thank you. Okay. We'll come down and greet counsel and proceed on to the next case. Thank you.
judges: Paul V. Niemeyer, DeAndrea Gist Benjamin, Barbara Milano Keenan